United States District Court
For the Northern District of California

1

2

3

4

5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   ROBERT L. WEIS II,                          No. C-05-05159 EDL

9              Plaintiff,                        **FINDINGS OF FACT AND**
                                                 **CONCLUSIONS OF LAW AFTER**
10     v.                                        **COURT TRIAL ON THE**
                                                 **ADMINISTRATIVE RECORD**
11  ACCIDENTAL DEATH &
    DISMEMBERMENT BENEFIT PLAN OF
12  KAISER FOUNDATION HEALTH PLAN
    INC.,
13
               Defendant.
14  _____/

15  **I.     INTRODUCTION**

16         The parties filed cross-motions for summary judgment regarding whether Defendant

17  Accidental Death & Dismemberment Benefit Plan of Kaiser Foundation Health Plan, Inc.

18  ("Defendant") erroneously denied Plaintiff Robert L. Weis' dismemberment claim.  The parties

19  stipulated that this Court reviews the denial de novo.  See Joint Case Management Statement

20  ("JCMS") at 3:19-20.  During the hearing, the parties did not object to the Court conducting the

21  proceedings by way of trial on the administrative record.  See Kearney v. Standard Ins. Co., 175

22  F.3d 1084, 1094-95 (9th Cir. 1999) (absent circumstances requiring admission of additional

23  evidence, courts conducting de novo review of an ERISA plan decision should conduct trial on

24  administrative record).  For the reasons set forth below, the Court denies the cross motions for

25  summary judgment, and finds in favor of Plaintiff after trial on the administrative record.

26  **II.    UNDISPUTED FACTS**

27         **A. The Accident.**

28         Plaintiff Robert L. Weis II was born with congenital cataracts.  Administrative Record

United States District Court
For the Northern District of California

1  ("AR") 42, 269.  When he was approximately five years old, Plaintiff underwent a needling

2  operation on his left eye.  AR 161, 269.  As a result of the needling operation, Plaintiff became

3  legally blind in his left eye, but he retained limited vision.  AR 161.  Plaintiff's limited vision had

4  remained stable since the needling operation, allowing him to count fingers at a distance of three feet

5  and, importantly, giving him depth perception.  AR 161.  Approximately thirty years later, on April

6  8, 2001, Plaintiff tripped in his home and jammed his thumb into his eye socket.  AR 152, 161.  He

7  saw a flash of light, felt extreme pain, and then lost all vision in his left eye.  AR 152, 161; see also

8  JCMS at 2:10-13.  Plaintiff consulted his regular ophthalmologist, Dr. Richard Brown, the following

9  morning.  AR 176, 214.  In his contemporaneous chart, Dr. Brown noted that Plaintiff "poked his

10  eye . . . last night[.]"  Id. at 176.  Dr. Brown explained that the pressure in Plaintiff's left eye that day

11  was 60 mmHg, four times the norm.  AR 161.  Dr. Brown diagnosed Plaintiff as having a severely

12  detached retina.  AR 161.

13       After the pressure in his eye stabilized to allow surgical intervention, Plaintiff underwent an

14  eight-hour emergency procedure to repair his torn retina.  See JCMS at 2:15-17; see also AR 161,

15  187-89.  Although the surgery initially restored Plaintiff's preexisting limited vision in his left eye,

16  Plaintiff developed complications from the surgery that eventually caused him to lose "100% of his

17  ability to see images from his left eye."  AR 161-62.

18       **B.  The Plan.**

19       Plaintiff is a participant in the Accidental Death & Dismemberment Benefit Plan of Kaiser

20  Foundation Health Plan, Inc. (the "Plan"), which is insured by a policy issued by AIG.  See Feinberg

21  Decl. ISO Pl.'s MSJ ("Feinberg Decl.") Ex. 1 (the "Policy").  Plaintiff was insured for the principal

22  sum of $350,000.  Id. at POL002.  Injury causing loss of sight of one eye is insured at 50% of the

23  principal sum, or $175,000.  Id. at POL011.  The Policy, which Plaintiff did not receive, defined

24  "Injury" as "bodily injury caused by an accident . . . and resulting directly and independently of all

25  other causes in a covered loss."  Id. at POL007.  "Loss" of an eye under the Policy "means total and

26  irrecoverable loss of the entire sight in that eye."  Id. at POL011.  The Policy excludes "any loss

27  caused in whole or in part, or resulting in whole or in part from, . . . sickness, disease or infections of

28  any kind . . ."  Id. at POL012.

2

United States District Court

For the Northern District of California

1    Instead of receiving a copy of the Policy, Plaintiff only received the Summary Plan

2  Description ("SPD").  See Second Feinberg Decl. Ex. 3 (SPD); see also AR 243.  Unlike the Policy,

3  the SPD only generally states that "Accidental Death and Dismemberment benefits are not payable

4  for death and dismemberment due to: most natural illnesses or diseases."  Second Feinberg Decl. Ex.

5  3 at SPD36.  The SPD does not define "injury."

6         **C.  Defendant denies Plaintiff's claim.**

7    Plaintiff applied for benefits under the Plan in October 2003.  JCMS at 3:11; see also AR

8  212-14.  In November 2003, Defendant sent a standard questionnaire to Dr. Brown, Plaintiff's

9  treating ophthalmologist.  AR 211.  That questionnaire posed only two questions: whether Plaintiff's

10  loss of sight was total and irrevocable; and whether the loss was "due to an accident direct and

11  independent of all other causes?"  Id.  Dr. Brown answered the first question positively, and the

12  second question negatively.  Id.  Subsequently, Dr. Brown submitted a letter in support of Plaintiff's

13  application, explaining that although he could not be 100% certain, he did not believe that Plaintiff's

14  detached retina was caused by his preexisting condition.  AR 161-62 (April 19, 2004 letter).

15  Although Defendant received Dr. Brown's letter (AR 28), it denied Plaintiff's claim on the ground

16  that his blindness was caused by a preexisting condition rather than by the accident.  AR 41-43.

17  Defendant relied on the opinion of Dr. Young, a specialist in ophthalmology, who reviewed the

18  entire administrative record but did not examine Plaintiff.  AR 41-42; see also AR 261-62.  Dr.

19  Young opined that Plaintiff's "retina was already severely damaged at the time [he] poked [his] eye,

20  and . . . neovascularization of the iris (rubeosis) of the left eye could not have occurred over a

21  several hour period.  It indicates a previously existing problem with the eye that predisposes [it] to

22  internal eye bleeds and high pressure.  Rubeos[i]s usually is the result of an ischemic process[] of

23  the retina, generally of at least several weeks standing (and often months)[.]"  AR 42.

24    Defendant upheld its decision on appeal.  AR 44-46.  Once again, Defendant relied on Dr.

25  Young's opinion, including Dr. Young's report of a conversation he had with Dr. Brown:

26    Dr. Young . . . spoke to Dr. Brown . . . .  Dr. Young specifically asked Dr. Brown "if
      he felt that the left eye iris neovascularization and retinal detachment noted by him . .
27    . was related to the poke in the left eye described by Mr. Weis as occurring on April
      8, 2001.["]  Dr. Brown replied "that he did not feel such an advanced detachment
28    with massive fibrovascular proliferation could have been the result of the poke in the
      eye["]. . . .  Dr. Brown stated to Dr. Young that more than likely, the poke in the eye

3

incident brought Mr[.] Weis's attention to the fact that the vision had changed in the left eye.

AR 45; see also AR 155.  Although Dr. Young acknowledged that Dr. Brown's April 19, 2004 explicitly stated that Plaintiff's preexisting condition did not likely contribute to the injury, Dr. Young discounted the importance of the letter because it did not expressly claim a causal relationship between Plaintiff's blindness and the accident.  AR 45.

## III.    ANALYSIS

### A.    The doctrine of reasonable expectations.

Because Plaintiff only received the SPD, this document informed his reasonable expectations for insurance coverage.  See Salterelli v. Bob Baker Group Med. Trust, 35 F.3d 382, 386-87 (9th Cir. 1994) (adopting doctrine of reasonable expectations as part of federal common law governing ERISA cases).  Whereas the Policy defines injury as one "directly and independently" caused by an accident, and excludes from coverage "any loss caused in whole or in part from . . . disease" (Feinberg Decl. Ex. 1 at POL007, POL012), the SPD only excludes accidental death and dismemberment "due to most natural illnesses or diseases" (Id., Ex. 3 at SPD36).  The SPD's more generous language could reasonably create different expectations than the more onerous language of the Policy.  In such cases, the language most favorable to Plaintiff controls:

> "Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.  Accuracy is not a lot to ask."

Bergt v. Ret. Plan for Pilots Employed by Markair, Inc., 293 F.3d 1139, 1145 (9th Cir. 2002). (quoting and adopting reasoning of Hansen v. Cont'l Ins. Co., 940 F.2d 971, 982 (5th Cir. 1991)). Nor does Washington v. Standard Ins. Co., 2004 U.S. Dist. Lexis 22975 (N.D. Cal. July 27, 2004), cited by Defendant, suggest otherwise because there the SPD did not conflict with the policy on the issue of causation.

### B.    Federal Courts generally apply federal common law in ERISA cases.

An insurer's narrow definition of "injury" as one that is independently caused by an accident does not defeat coverage of an insured whose preexisting condition contributed to his injury *unless*

4

United States District Court

For the Northern District of California

1    the policy documents conspicuously set forth this exclusion:

2         [W]e hold that if the exclusionary language here in question is conspicuous it would
          bar recovery if a preexisting condition substantially contributed to the disability.
3         This could result in a denial of recovery even though the claimed injury was the
          predominant or proximate cause of the disability.  On the other hand, we hold that if
4         the language is inconspicuous, a policy holder reasonably would expect coverage if
          the accident were the predominant or proximate cause of the disability.
5

6    McClure v. Life Ins. Co. of N. Am., 84 F.3d 1129, 1136 (9th Cir. 1996).  Because Defendant did not

7    conspicuously set forth this exclusion in the SPD, Defendant must provide coverage as long as the

8    accident was the predominant or proximate cause of Plaintiff's loss.  Defendant concedes that the

9    predominant or proximate cause standard applies here.

10        Plaintiff nonetheless argues that California law applies directly, based on Plaintiff's

11   perception that California law is more favorable.  However, federal courts in the Ninth Circuit have

12   adopted California's proximate cause test as part of the federal common law governing ERISA cases

13   such as this one.  See McClure, 84 F.3d at 1135-36.  In McClure, the Ninth Circuit endorsed as the

14   proper standard under federal common law the proximate cause standard adopted by a California

15   District Court, rather than the substantial cause test adopted by the Fourth Circuit.  Id. (comparing

16   Henry v. Home Ins. Co., 907 F. Supp. 1392 (C.D. Cal. 1995), with Adkins v. Reliance Standard Life

17   Ins. Co., 917 F.2d 794 (4th Cir. 1990)).  Under the Fourth Circuit's Adkins test, the existence of a

18   preexisting condition bars coverage where the condition "substantially contributed to the disability

19   or loss" when the policy conspicuously limited coverage to losses caused by accidents "directly and

20   independently" of other causes.  Adkins, 917 F.2d at 795-97.  By contrast, Henry "allowed recovery,

21   adopting as federal common law a test 'requiring the plaintiff to show that the accident was the

22   predominant, as opposed to remote, cause of the injury.'"  McClure, 84 F.3d at 1135 (quoting Henry,

23   907 F. Supp. at 1398).  After comparing the two standards, the Ninth Circuit concluded that the

24   "Central District's more liberal rule applied when the exclusionary language" of an ERISA policy

25   was inconspicuous.  McClure, 84 F.3d at 1136.

26        The Central District's holding in Henry was in turn grounded on its adoption of the

27   proximate cause standard applied by California state courts.  See Henry, 907 F. Supp. at 1398.

28   Although the ERISA policy at issue in Henry excluded from coverage any injury that was not the

5

United States District Court

For the Northern District of California

1    direct and independent result of a covered hazard, the <u>Henry</u> Court refused to apply the exclusionary

2    policy provisions because they had not been conspicuously identified in the ERISA plan documents.

3    907 F. Supp. at 1396-97.  Having concluded that the policy's requirement of "direct and

4    independent" causation defeated the reasonable expectations of the insured, the <u>Henry</u> Court decided

5    whether to follow the <u>Adkins</u> standard on the one hand, or the standards applied by the Colorado and

6    California state courts on the other.  Colorado applied a proximate cause test.  <u>Id.</u> at 1398 (citing

7    <u>Carroll v. CUNA Mut. Ins. Soc'y</u>, 894 P.2d 746, 754-55 (Colo. 1995)).  California, the <u>Henry</u> Court

8    determined, "also applies a proximate cause test. . . .  That is, if the accident 'sets in progress the

9    chain of events leading directly to death [or injury]' then a plaintiff can recover regardless of

10   preexisting medical condition."  907 F. Supp. at 1398 (citing <u>Slobojan v. Western Travelers Life Ins.</u>

11   <u>Co.</u>, 70 Cal. 2d 432, 443 (1969)).  The <u>Henry</u> Court concluded

> that the predominant cause test better comports with the reasonable expectations of
> insureds.  The focus of an analysis under the predominant cause test is on the effect
> the accident had on the insured.  The Fourth Circuit's substantial factor test, by
> contrast, focuses on the effect the insured's health had on the accident. . . .  Under the
> predominant cause test, if a plaintiff can show that the accident directly caused the
> resulting injury, then recovery is appropriate, even where a genetic predisposition,
> susceptibility or preexisting condition may have contributed to the extent of the harm.
> Because this test comports with the reasonable expectations of insureds, the court
> adopts it as part of the federal common law governing ERISA.

17   <u>Id.</u> at 1398.  Thus, <u>Henry</u> adopted the reasoning of California courts, which had long held that the

18   proximate cause of a loss is the cause that sets the loss in motion, or is the triggering or efficient

19   moving cause of the loss.  <u>See</u> <u>Sabella v. Wisler</u>, 59 Cal. 2d 21, 31-32 (1963) (defining "proximate

20   cause" alternatively as the cause that sets others in motion or the cause that is the predominating

21   cause and comparing facts of the case to <u>Brooks v. Metropolitan Life Ins. Co.</u>, 27 Cal. 2d 305, 309-

22   10 (1945) ("the presence of preexisting disease or infirmity will not relieve the insurer from liability

23   if the accident is the proximate cause of death; and that recovery may be had even though a diseased

24   or infirm condition appears to actually contribute to cause the death if the accident sets in progress

25   the chain of events leading directly to death, or if it is the prime or moving cause")).  Like <u>Sabella</u>,

26   <u>Slobojan</u> followed the California Supreme Court's earlier decision in <u>Brooks</u>.

27         Relying on <u>Slobojan</u> and thus on the <u>Brooks</u>/<u>Sabella</u> line of cases, the <u>Harvey</u> Court did not

28   address <u>Garvey v. State Farm Fire & Cas. Co.</u>, 48 Cal. 3d 395 (1989), in which the California

United States District Court

For the Northern District of California

1  Supreme Court clarified the efficient proximate cause standard.  In <u>Garvey</u>, the California Supreme

2  Court reiterated that a remote cause of a loss could not be the proximate cause of the loss.  <u>Id.</u> at 402

3  (citing <u>Sabella</u>).  At the same time, the California Supreme Court explained that a cause that did not

4  trigger a loss or was not the immediate cause of a loss could nonetheless be the proximate cause of

5  the loss if it was the predominant cause of the loss.  48 Cal. 3d at 404; <u>see also</u> <u>Tento Int'l, Inc. v.</u>

6  <u>State Farm Fire & Cas. Co.</u>, 222 F.3d 660, 663 (9th Cir. 2000) (<u>Garvey</u> determined "that the

7  efficient proximate cause is 'the predominating' or 'most important cause of the loss").  The <u>Garvey</u>

8  Court sought to ensure that coverage would not be denied where the predominant cause was not the

9  triggering or immediate cause of the loss:

> <u>Sabella</u> defined "efficient proximate cause" alternatively as the "one that sets others
> in motion" . . . and as "the predominating or moving efficient cause." . . .  We use the
> term "efficient proximate cause" (meaning predominating cause) when referring to
> the <u>Sabella</u> analysis because we believe the phrase "moving cause" can be
> misconstrued to deny coverage erroneously, particularly when it is understood
> literally to mean the "triggering" cause.

14  48 Cal. 3d at 403; <u>see also</u> <u>State Farm Fire & Cas. Co. v. Von Der Lieth</u>, 54 Cal. 3d 1123, 1132

15  (1991) (describing <u>Garvey</u>'s "proximate cause" language as being broader than <u>Sabella</u>'s "moving

16  cause" language).

17  Because California's proximate cause standard has been adopted in the Ninth Circuit as part

18  of the federal common law, the Court accordingly need not reach the parties' remaining arguments

19  regarding California Insurance Code section 530 or the ERISA Savings Clause.

20  **C.  The Administrative Record establishes by a preponderance of the evidence that**
**the accident was the proximate cause of Plaintiff's loss.**

22  The Court makes the following findings of fact and conclusions of law.  The weight of the

23  evidence in the Administrative Record establishes that Plaintiff's accident was the efficient

24  proximate cause of his total and irrevocable loss of sight in his left eye.  First, it is undisputed that

25  on April 8, 2001, Plaintiff had 20/400 vision in his left eye, could count fingers at three feet, and

26  experienced depth perception.  <u>See</u> JCMS at 2:19-21; AR 161.  It is also undisputed that

27  "[i]mmediately following the accident . . . Mr. Weis had no vision in his left eye.  The surgery was

28  initially successful in restoring Mr. Weis's vision, but following the surgery, two primary

7

United States District Court

For the Northern District of California

1   complications occurred which prevented further surgery and worsened the vision in Mr. Weis's left

2   eye. . .   Mr. Weis has lost all vision in his left eye."   Id. at 2:20-26; see also AR 27 (time line

3   showing that surgery occurred 4/16/01, vision returned to 20/400 by 6/15/01 and on 4/5/02 was

4   "stable").

5          Second, Plaintiff's own physician opined that "the majority of the evidence indicates Bob's

6   accidental retinal detachment in his left eye was not related to his previous medical condition . . . :

7   (1) Bob had no previous history of retinal problems with his left eye[.]  (2) Bob's left eye pressure

8   was historically always within normal parameters.  (3) Bob had no history of problems with his left

9   cornea before the 2001 surgery."  AR 162.  Dr. Brown also persuasively explained his earlier

10  response to Defendant's form questionnaire, in which Dr. Brown answered "No" when asked

11  whether the loss of sight was "due to an accident direct and independent of all other causes?"  AR

12  161, 211. (Defendant's question, of course, applied the wrong standard.)  Dr. Brown explained that

13  "by answering 'No' to the examiner's question I was not saying that Mr. Weis had zero sight in his

14  left eye" before the accident.  AR 161.  Plaintiff's treating physician therefore opined that the injury

15  which occasioned the need for surgery most likely was not related to any preexisting condition.

16         Third, Defendant asked Dr. Young as well as Dr. Brown to address the causes of Plaintiff's

17  injury based on the erroneous "independently and directly" standard, rather than on the appropriate

18  proximate cause standard described in Henry.  See AR 211, 297.  As noted above, Defendant used

19  this erroneous standard on the form questionnaire it sent to Dr. Brown, which Defendant repeatedly

20  mentioned when evaluating Plaintiff's claim.  AR 211 (questionnaire), 41 (initial denial), 21 (appeal

21  committee referral notes), 27 (File Activity Sheet), 261 (letter from Dr. Young).  Defendant also

22  applied this erroneous standard when it originally denied Plaintiff's claim and again on appeal.  Id.

23  at 41-43, 44-46.  Defendant did not ask either Dr. Brown or Dr. Young whether the accident was the

24  proximate cause of Plaintiff detaching his retina to the point that he suddenly experienced a total

25  loss of sight and required surgery to regain the limited but crucial vision (especially depth

26  perception) that he had had since childhood.  Nor did Defendant ask whether the surgery caused the

27  complications which ultimately resulted in Plaintiff's total loss of sight.  That Plaintiff may have

28  been legally blind in one eye and may have been prone to retinal detachment simply does not answer

8

United States District Court

For the Northern District of California

1  whether the accident created the loss of sight that he had enjoyed until then, created the need for

2  surgery, thereby proximately causing the permanent total loss of sight in that eye.

3      Finally, although the Court has taken into account Dr. Young's opinions, the Court does not

4  accord them as much weight as Dr. Brown's signed, written opinion and Plaintiff's own

5  observations.  Notably, Dr. Young's opinions are based on generalities rather than on the facts of

6  Plaintiff's particular case.  See, e.g., AR 249 ("Such a condition (rubeosis) *usually* is the result of an

7  ischemic process[es] in the retina, *generally* of at least several weeks standing (and often months)"

8  (emphasis added)).  He did not opine that Plaintiff could not have been an exception to the general

9  rule based on his unique medical history.  Dr. Young, who resides in Arizona, never examined

10  Plaintiff, while Dr. Brown was his treating ophthalmologist, and examined Plaintiff both before and

11  after the accident.  Further, Dr. Brown has a responsible position in the Eye Department at Kaiser

12  Permanente in Oakland.  AR 162 (Chief of department); AR 214 (identified as Assistant Physician

13  in Chief on department letter-head).  While Dr. Young opines that Plaintiff's preexisting condition

14  predisposed Plaintiff to internal eye bleeds, high pressure, and retinal detachment, and speculates

15  that Plaintiff simply did not notice his loss of sight until the accident, he does not reconcile this

16  opinion with the medical evidence noted by Dr. Brown that supports the opposite conclusion: before

17  the accident, Plaintiff had no previous history of retinal problems, his eye pressure had always been

18  within normal parameters, and he had no corneal problems.  Compare AR 162 with AR 239, 249.

19  Also, Dr. Young's speculation that Plaintiff incorrectly reported that he did not lose sight in his left

20  eye until the accident and somehow failed to notice the total loss of sight and attendant loss of depth

21  perception prior to his accident (AR 262) is not persuasive.  Dr. Young did not give a satisfactory

22  explanation for discrediting Plaintiff's own report of his change in vision before and after the

23  accident.  In particular, he failed to explain how an individual who had sufficient sight to see

24  images, notice letters on an eye chart, count fingers at a distance of three feet, and had depth

25  perception could fail to notice the loss of those abilities and attendant impact on his daily life if the

26  loss indeed occurred some time prior to the accident, as Dr. Young speculated.

27      Finally, the Court accords less weight to Dr. Young's second-hand report of his alleged

28  conversation with Dr. Brown (AR 155) than it does to Dr. Brown's signed letter (AR 161-62).  For

9

one, Dr. Young pursued his inquiries based on the flawed premise that the Policy excluded coverage

for preexisting conditions which contributed to Plaintiff's injury, even if those conditions were not

the proximate cause.  Moreover, the fact that Dr. Brown set out his opinion in a precise, signed letter

relying on specific medical evidence, any inconsistencies with his alleged oral comments to Dr.

Young may well have been inaccurately heard or reported.  Finally, Dr. Brown's written opinion is

more on point, comprehensive, and consistent with the medical evidence that it cites.

Although Plaintiff's preexisting condition may well have contributed to the extent of his

injuries, the Court concludes that the preponderance of evidence in the Administrative Record

establishes that the accident was the proximate cause of Plaintiff's total loss of sight in his eye.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff's accident was the proximate or

predominant cause of his total loss of vision in his left eye.  Plaintiff is entitled to recover $175,000

from Defendant under the terms of the Policy.

**IT IS SO ORDERED.**

Dated: August 14, 2006

ELIZABETH D. LAPORTE
United States Magistrate Judge

10